IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL ACTION NO. |
| v. | ) | 2:20cr12-MHT |
| | ) | (WO) |
| JEFFREY SCOTT CARTER | ) | |

OPINION

Defendant Jeffrey Scott Carter pleaded guilty to a one-count indictment of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  At sentencing, after resolving issues related to the application of Guidelines 2K2.1(b)(6)(B) and 3C1.1, U.S. Sent'g Guidelines Manual §§ 2K2.1(b)(6)(B) and 3C1.1 ("U.S.S.G."), the court granted a downward variance of one and a half years, which resulted in a sentence of 33 months of imprisonment.  The court also imposed three years of supervised release that is expected to include substantial mental-health and substance-abuse treatment, the specifics of which the court will determine upon Carter's release.  The court writes to explain further

its decisions regarding the variance and the application of Guideline 2K2.1.

## I.

The court rejected the government's argument that Guideline 2K2.1(b)(6)(B) applied in this case. As relevant here, that guideline provides a four-level enhancement of a defendant's offense level when the defendant "used or possessed any firearm or ammunition in connection with another felony offense." U.S.S.G. § 2K2.1(b)(6)(B). An application note explaining this guideline indicates that it applies when the firearm with which the defendant is charged "facilitated, or had the potential of facilitating, another felony offense." U.S.S.G. § 2K2.1 cmt. n.14.

In this case, the firearm that Carter pleaded guilty to possessing was found in a backpack in the mobile home where he was arrested. The government argued that he should receive the four-level enhancement under Guideline 2K2.1(b)(6)(B) because it was undisputed that he arrived

2

to the mobile home in a stolen truck and had the firearm with him at that time.  The government's position was that the firearm "provid[ed] a potential means of protecting the stolen property" and thus could have facilitated a felony offense of receipt of stolen property because "Carter's possession of a firearm, while he was also in possession of a stolen vehicle, emboldened his felonious conduct."  Govt's Supplemental Sentencing Memorandum (doc. no. 69) at 1.  In other words, in the government's view, Carter's bare possession of the pistol while he was driving the stolen truck was sufficient for the enhancement to apply.

The court rejected this argument.  Based on the evidence presented during the hearing, including Carter's testimony about why he had the handgun at issue, the court found that Carter had the gun simply as an item of barter to get money for drugs.  As will be discussed below, Carter is severely addicted to synthetic marijuana and methamphetamine, and his days consist of buying and selling property--often stolen--for small amounts of

3

money to keep himself intoxicated.   He admitted at sentencing that he traded some stolen items in exchange for the gun and intended to sell it onward, just like any other piece of property he came into possession of, for enough cash to stay high.

It was undisputed that Carter had the pistol for a week at most before he was arrested.   When asked why he had the pistol, he credibly testified that, "I had got it on a cheap deal.   I had it to sell it."   Tr. of Nov. 12 Hr'g (doc. no. 66) at 16.   In other words, this was not a weapon Carter used to steal property or kept on-hand to protect his stolen property.   Indeed, despite Carter's long criminal history, it does not appear that he has ever used a firearm or any other weapon in a crime.   With the exception of a single charge of misdemeanor assault nearly 14 years ago, apparently stemming from a fistfight that broke out while he was buying drugs, he has no violent convictions in his record.   For all of these reasons, the court found that the gun did not embolden Carter's receipt of the truck he was driving on the day

4

he was arrested and that there was no realistic potential
that he would use the gun to protect the truck in any
circumstances.

To support its argument to the contrary, the
government cited five cases: one in which this court
noted that determining "whether possession of the gun may
have 'emboldened' the defendant's felonious conduct" is
relevant to deciding whether Guideline 2K2.1(b)(6)
applies, *United States v. Osborne*, 590 F. Supp. 2d 1330,
1335 (M.D. Ala. 2008) (Thompson, J.), and four cases in
which various federal Courts of Appeals have found it
reasonable for a sentencing court to apply this guideline
when the facts showed that a firearm had the potential
of emboldening additional felonies or protecting the
defendant's stolen property.

This court's decision in *Osborne* supported its
decision here not to apply Guideline 2K2.1(b)(6) in this
case. In *Osborne*, the court found the guideline
inapplicable to a defendant who possessed a gun at the
same time that he possessed a small amount of the drug

5

ecstasy.  *See id.* at 1335-36.  On the evidence presented in that case, the court found that the gun had not emboldened Osborne's possession of the ecstasy; the facts showed that Osborne's gun and his personal-use quantity of ecstasy were essentially unconnected.

Just as the court in *Osborne* found that Osborne's gun had not emboldened his drug possession, so the court found here that the pistol Carter had when he arrived at the mobile home did not embolden his possession of the truck.  As the court explained in *Osborne*, "[e]ach decision must turn on the particular facts of each case." *Id.*  Whether a gun has emboldened a defendant's criminal conduct is a "very fact-intensive question."  *Id.* at 1336.  As discussed above, the facts led the court to conclude that the gun did not embolden Carter's offense. The court therefore found that Guideline 2K2.1(b)(6) did not apply.

Each of the other cases cited by the government presented facts strikingly different from those in Carter's case, and none persuaded the court that the

6

four-level enhancement of Guideline 2K2.1(b)(6)(B) was appropriate here.  A short recital of the circumstances of the government's cases shows why.

In *United States v. Gattis*, 877 F.3d 150 (4th Cir. 2017), the Fourth Circuit Court of Appeals affirmed an application of the enhancement where the defendant was "engaged in an ongoing felony conspiracy" involving "thousands of dollars worth of items that had been stolen during at least six different burglaries."  *Id.* at 161. Among the items the defendant stole were a handgun, a semiautomatic rifle, and two assault rifles, "as well as several fully loaded large capacity magazines," and he had been reported firing an automatic weapon at a residential street sign.  *Id.* at 152.  The appellate court held that it was reasonable for the sentencing court to conclude that the loaded weapon the defendant had with him when he was arrested may have served "as a

potential means of protecting the stolen goods." *Id.* at
161.

In *United States v. Basnett*, 735 F.3d 1255 (10th Cir.
2013), the defendant was involved in a theft ring of
hundreds of thousands of dollars of property, much of
which he kept in his home along with "an extensive supply
of guns and ammunition." *Id.* at 1262. Fourteen different
guns were found in the home, including several "out in
the open." *Id.* The Tenth Circuit Court of Appeals held
it reasonable for the sentencing court to infer "[f]rom
the volume of stolen property, guns, and ammunition at
the home" that the defendant "kept the guns in connection
with his transportation of stolen property." *Id.*

The other cases come no closer to the facts here.
In *United States v. Valenzuela*, 495 F.3d 1127 (9th Cir.
2007), the Ninth Circuit Court of Appeals held it
reasonable for the sentencing court to apply the
enhancement when the district court found that the
defendant's possession of a loaded pistol-grip shotgun--a
shotgun he reached for when stopped by the police--had

**8**

in fact emboldened his receipt and sale of stolen property. *Id.* at 1129-30, 1135-36.  And in *United States v. Bjerke*, 744 F. App'x 319 (8th Cir. 2018) (per curiam), the Eighth Circuit Court of Appeals found it reasonable for the sentencing court to conclude that the enhancement applied to a defendant who testified that he carried guns with him during his burglaries "because doing so 'ma[kes] [him] feel more powerful.'"  *Id.* at 323 (alterations in original).

All of these cases involved significant indicia that the defendants actually kept firearms for the purpose of protecting their stolen property or facilitating thefts. No such indicia appear in this case as to the truck at issue.  Instead, the facts here pointed the court to the contrary conclusion: Carter did not have the gun to protect the truck and would not have used it to do so. In the context of all the facts presented, the fact that Carter had the gun while he was driving the stolen truck did not convince the court that the gun "facilitated, or

had the potential of facilitating," his receipt of the truck.  U.S.S.G. § 2K2.1 cmt. n.14.[1]


II.

With the issue of Guideline 2K2.1(b)(6)(B) resolved, the court turned to considering Carter's motion for a variance.  The court's decision to grant a variance was based largely on evidence of pervasive trauma during his childhood and the testimony of Dr. Adriana Flores about the effects of this trauma on his culpability for the present offense.[2]  The court was persuaded by Dr. Flores's testimony that Carter's severe childhood trauma affected

_____

1.  Moreover, as the court explained at sentencing, the unfairness of applying a four-level enhancement in Carter's case when the link between the firearm and the stolen property was as peripheral as it was here would have led the court to vary downward four levels even if it had found the enhancement to apply, resulting in the same ultimate sentence.

2.  As used in this opinion, the court means "culpability" in the sense of relative blameworthiness, rather than in the sense of legal responsibility for an offense.  *See United States v. Coleman*, No. 2:18-cr-277-MHT, 2019 WL 430910, at *2 (M.D. Ala. Feb. 4, 2019) (Thompson, J.).

his culpability in two significant ways.  First, it led directly to his multiple drug addictions, which began as efforts to self-medicate his post-traumatic symptoms, and which led in turn to his criminal conduct.  And, second, the neurological effects of the trauma he experienced while his brain was still developing likely impacted his capacities to reflect on the consequences of his conduct and to adjust his behavior accordingly, in much the same way that addiction impacts the ability of addicted individuals to avoid illicit substances.  These cognitive effects were compounded by the multiple drug addictions from which he has suffered since childhood as a result of his trauma.

A brief discussion of Carter's background is necessary to understand the reasons for the court's decision.  Carter grew up on a large property where his paternal grandparents and his father's siblings and their families lived as well.  This property was owned by his paternal grandfather, whose construction business provided for the family financially.

As Dr. Flores testified, the men in Carter's family were "extremely violent."  Carter was exposed to a startling amount of violence nearly from birth.  His father was meth-addicted and alcoholic, and he beat Carter, his sisters, and his mother almost daily.  Carter and his mother experienced the most savage attacks, each becoming the focus of his father's anger when they attempted to shield the other.  At an age when children begin to form their first lasting memories, Carter watched his father beat his mother to the floor of their home and kick her while she lay there.  When Carter was two or three years old, his mother stabbed his father in the chest with a kitchen knife to protect herself during one of his attacks; open-heart surgery evidently was required to save his father's life.

Throughout his childhood, Carter's male relatives made a habit of shooting each other and his female relatives when angry.  His paternal grandfather shot one of Carter's uncles when the uncle jumped in front of Carter's grandmother, whom his grandfather had intended

to shoot.   About a year later, another uncle shot Carter's grandfather to prevent him from shooting at his grandmother again.   When Carter was five or six years old, his grandfather shot his father in the back with a shotgun.   This gunplay, which was at once routine and horrific, culminated when his father shot and killed his grandfather in their front yard when Carter was 10 years old.   Until he dropped out of school five years later, Carter would cross the yard, where his grandfather died, every day to reach the school bus.

When Carter was nine years old, his mother took him and his sisters and fled the violence.   This apparently occurred after she was told by a police officer responding to a particularly vicious beating that she should go immediately to a women's shelter, because the abuse had become so severe that the officer believed she was likely to be killed if she stayed.   Soon, however, Carter returned to visit his father's family, and his parents agreed that he would remain there in exchange for

13

his mother keeping custody of his sisters.[3]  Carter asked
to stay with his father's family primarily because of his
close relationship with his paternal grandfather, whom
his father killed the following year.

By age eight or nine, Carter had been prescribed
psychiatric medication to treat depression related to his
repeated traumas, but his family refused to give him the
medication and ended his psychiatry appointments.  By age
12, Carter had begun self-medicating his depression with
hallucinogenic mushrooms that grew on the family
property.  He moved on to marijuana at 13, alcohol at 14,
and both methamphetamine and prescription
benzodiazepines at 15 or 16.  Carter remains severely
depressed and intermittently suicidal.  He has never
received substance-abuse treatment, and until his

---

3.  Carter's sisters have done well after growing up
away from his father's family.  They all graduated high
school and obtained stable careers, and none have
criminal convictions.  The contrast between their lives
and Carter's highlights both the damage that Carter's
home environment did to his childhood development and the
lasting effects of this trauma.

confinement on the current offense he had never received antidepressant medication.

After his grandfather's killing, the remaining family ostracized Carter and his father, and the income from the construction business ceased, resulting in deep poverty for the rest of his childhood. Carter's father continued to beat him until he grew big enough to fight back in his teenage years. By that time, Carter's father was also supplying him with alcohol, methamphetamine, and occasional heroin. Carter dropped out of school at age 15, partly as a result of his drug and alcohol use and partly because he needed to work to support himself and his father.

The scope of the trauma that Carter experienced in his youth was exceptional. Dr. Flores testified that she had never encountered a family as violent as Carter's in 20 years of conducting psychological evaluations. Moreover, the subsequent developments of Carter's life, including his criminal history and the present offense, have been shaped by this trauma to an unusual degree. It

15

is this relationship between his offense and the trauma of his childhood that led to the variance granted by the court.  The following sections explain this relationship and how the sentencing factors set forth in 18 U.S.C. § 3553(a) apply to it.


                              III.

    Dr. Flores testified that the events of Carter's early life amounted to a large number of what psychologists call "adverse childhood experiences," or ACEs.  According to her testimony, these are categories of traumatic experiences--such as physical abuse and witnessing domestic violence--that may occur during a person's childhood.  As Dr. Flores explained, research on ACEs shows that these experiences powerfully affect children's brain development and life outcomes.

    Dr. Flores told the court that the number of ACEs a person has experienced correlates closely with the individual's long-term risks of depression, suicidality, and even chronic health problems such as cancer and

                              **16**

diabetes.  People who experience multiple categories of ACEs also are at higher risk of continued victimization in adulthood.  Moreover, ACEs have neurological effects on children that bear life-long consequences.  ACEs affect brain development in ways that make it difficult for people, both during childhood and as they grow up, to modulate their emotions, constrain their impulses, and perform certain executive functions like planning ahead and balancing responsibilities.  Those cognitive deficits can lead to trouble succeeding in school and retaining employment.  All told, this constellation of symptoms creates an exceptionally high incidence of substance abuse among people who have experienced multiple categories of ACEs.

This court has previously found that substance-use disorders change individuals' brain functioning in ways that make it difficult for people grappling with addiction to avoid relapses during the course of their recovery.  *See United States v. Mosley*, 277 F. Supp. 3d 1294, 1298 (M.D. Ala. 2017) (Thompson, J.).  In light of

this finding, the court has determined that sentencing a drug-addicted defendant for a drug offense without considering whether the conduct was caused by the individual's substance-use disorder would risk "punishing a defendant for his or her disease." *Id.* at 1298. And the court found that it can be appropriate to reduce a defendant's sentence when his or her conduct is caused by a substance-use disorder because a person who uses drugs due to a disease outside the individual's immediate control is less culpable than a person who uses drugs with full volition. *See United States v. Mosley*, 312 F. Supp. 3d 1289, 1293-95 (M.D. Ala. 2018) (Thompson, J.).

The court was convinced by Dr. Flores's testimony in this case that the same diminishment of culpability is true of criminal conduct arising from childhood trauma. The implementation across the country, including in Shelby County, Alabama, of specialized courts that divert veterans from incarceration to mental-health care reflects the acknowledgement that culpability is

mitigated when an offense stems from combat-related trauma. *See* Jeremiah Glassford, Note, "*In War, There Are No Unwounded Soldiers*": *The Emergence of Veterans Treatment Courts in Alabama*, 65 Ala. L. Rev. 239, 252-55 (2013). Ignoring the effects of childhood trauma would needlessly limit this acknowledgement to people who experience trauma as adults. This strikes the court as particularly inappropriate in light of the apparent impacts of childhood trauma on brain development and functioning.

After hearing Dr. Flores's testimony, the court found that failing to consider whether Carter's trauma contributed to his conduct would turn a blind eye to the well-documented consequences of adverse childhood experiences and would risk punishing Carter for a mental-health condition just as much as it would to punish a drug-addicted individual for drug possession without considering the impact of his or her disorder. *See Mosley*, 277 F. Supp. 3d at 1298 (finding that "drug addiction is a mental illness" and that sentencing courts

should therefore give "proper weight to whether and how
that mental disorder affects [a defendant's] culpability
for his conduct").  For this reason, the court turned to
considering what role, if any, Carter's adverse childhood
experiences played in his commission of the current
offense and whether the impacts of his trauma affected
what sentence was appropriate for his conduct under the
factors of 18 U.S.C. § 3553(a).


                              IV.

     In this case, Dr. Flores's testimony regarding her
evaluation of Carter made clear that his adverse
childhood experiences contributed directly to the
commission of his offense.

     First, the roots of his criminal conduct lay in his
drug addictions, and the roots of his drug addictions lay
in his childhood trauma.  As Dr. Flores testified,
Carter's adverse childhood experiences put him at extreme
risk of developing substance-use disorders.  She
explained that the risk of substance abuse and other

                              20

mental-health consequences rises with the number of categories of ACEs a child endures. According to her testimony, there are 10 basic categories of ACEs: emotional abuse; physical abuse; sexual abuse; witnessing domestic violence; substance abuse in the home; mental illness in the home; parental separation or divorce; having an incarcerated family member; emotional neglect; and physical neglect. A person's risk of serious, long-term adverse effects becomes very high once the individual has experienced four of these 10 categories. Dr. Flores testified that Carter's childhood involved either eight or nine of the 10 categories of ACEs: all of them except sexual abuse and possibly parental mental illness, which she suspected but could not verify. Moreover, many of these experiences--such as witnessing domestic abuse--were repeated daily for years during Carter's upbringing.

The risks created by such extensive childhood trauma were borne out for Carter. His trauma caused him depression significant enough to require medication by

the time he was eight or nine years old.  When his family prevented him from receiving the medication he needed, the young Carter turned to using drugs to soften the symptoms of his ongoing trauma.  He started with hallucinogenic mushrooms that grew on the family's property, but he quickly advanced to more addictive substances in his early teenage years.  This progression was facilitated by his father, who was himself addicted to alcohol and methamphetamine, and who supplied both to Carter during his adolescence.  Dr. Flores determined that, as a result of these overlapping addictions, Carter, who is now 35 years old, has not experienced a period of sustained sobriety since he began using hallucinogenic mushrooms at the age of 12, including during periods of incarceration.

Once his addictions became too severe for Carter to maintain employment, he turned to flipping mostly stolen goods for enough money to buy the drugs he required.  As discussed earlier in this opinion, Carter testified at sentencing that he obtained the firearm with which he was

charged simply as another commodity to sell for drug money.  In other words, his possession of the firearm at issue was a direct result of his addictions and the trauma that caused them.

Second, Dr. Flores's testimony made clear that Carter's childhood trauma and the drug addictions to which it led affect his capacity to consider consequences and restrain his impulses.  As Dr. Flores explained, Carter's constant trauma throughout his youth meant that he experienced no period of normal psychological or neurological development.  His continued involvement in buying and selling stolen goods for small profits to fund his drug addictions evidences the resulting difficulty he has appreciating the long-term effects of his actions. Carter has two daughters, and the court was convinced by his testimony that he recognizes the importance of being present in their lives as a better father than his own. He nonetheless continues to use drugs and to structure his life around obtaining them.  Based on Carter's testimony and that of Dr. Flores, the court found that

this is not a product of simple character flaws, but of pressing and unaddressed mental-health needs.

In other words, the connection between Carter's trauma and his criminal conduct is not ephemeral or theoretical.  His trauma affects his brain in concrete ways that have made it difficult for him at every turn to avoid falling into addiction and a life of property crimes to support his drug use.  To be sure, as Dr. Flores acknowledged, some people who experience even childhood trauma as severe as Carter's and receive no mental-health treatment for it are nonetheless able to escape the depression, addictions, and resulting criminal conduct that have characterized his life since his teenage years. But Carter's culpability for failing to surmount this obstacle is not heightened by the improbable successes of those who do.

In light of Carter's history, he has done well to have generally avoided reproducing the violence he experienced and watched others experience throughout his childhood at the hands of the men in his family.  The

**24**

court commends him for this.  Furthermore, the fact that he has not become the violent man his father and grandfather were, as well as Dr. Flores's testimony that Carter has shown remarkable psychological resilience in not developing flashbacks or other symptoms of post-traumatic stress disorder (also known as PTSD), give the court hope that its intervention does not come too late.

In this case as in all others, the court's duty was to assess Carter's culpability through the sentencing factors enumerated in 18 U.S.C. § 3553(a).  The above findings went squarely to the application of § 3553(a)(1), which commands a sentencing court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant." Furthermore, inquiry into a defendant's childhood trauma and resulting mental-health symptoms is appropriate under § 3553(a)(5), which requires the court to look to "pertinent policy statement[s]" issued by the Sentencing Commission.  The Commission has explained in a policy

25

statement that "[m]ental and emotional conditions" that are "present to an unusual degree" are mitigating factors in determining a defendant's sentence. U.S.S.G. § 5H1.3. Although this policy statement comes in the context of departures rather than variances, it is relevant to understanding the circumstances that the Commission reasonably believes affect a defendant's culpability and appropriate sentence, particularly in light of § 3553(a)(5). The extraordinary trauma of Carter's childhood and the lingering mental-health effects of that trauma brought his case outside the norm.

In addition, several of the factors of § 3553(a)(2) indicated that a downward variance was warranted in this case. Dr. Flores's evaluation of Carter, which the court found well-supported by her testimony and the research she described, indicated that Carter's only chance at turning his life around would be through long-term inpatient treatment for both his substance-use disorders and his underlying trauma. Although the court recommended that he receive mental-health and

substance-abuse treatment while in custody, this is unlikely to be sufficient both because some of the intensive treatments he needs may be unavailable in Bureau of Prisons facilities and because his addictions are sufficiently durable that he has remained intoxicated while in prison before. Without inpatient treatment addressing both his substance abuse and trauma, Dr. Flores found, Carter will all but inevitably continue to maintain his addictions and related criminal activities.

Put in the context of § 3553(a)(2), these findings convinced the court that protracted incarceration would do little to deter subsequent criminal conduct by Carter; until he receives the treatment he needs, his addictions and criminality will remain largely beyond his control. *See* 18 U.S.C. § 3553(a)(2)(B). For much the same reason, the court was convinced that getting Carter into treatment as soon as possible was the best way to protect the public; his criminality will end only when his substance-use disorders and underlying trauma are

27

addressed.  *See id.* § 3553(a)(2)(C).  A downward variance allows the court to provide Carter with critical care and treatment in the most effective manner because of the unsuitability discussed above of the correctional setting for giving him the drug and mental-health treatment he requires.  *See id.* § 3553(a)(2)(D).

Finally, punishment is an important § 3553(a) factor.  But the need for punishment in this case was less than it could have been because there was no evidence that Carter ever used the pistol at issue or threatened anyone with it.  He did not dispose of it to anyone who might have used the weapon for violence, and he did not possess it in connection with another crime causing significant public harm, such as drug distribution.  His conduct here was entirely non-violent.  Carter appears to have traded some stolen items for a pistol, held the firearm for a week, and then been arrested.  In light of the connection between this conduct and Carter's substantial mental-health needs, the court found that the sentence it ordered was "sufficient, but not greater than

necessary" to "reflect the seriousness of the offense ... and to provide just punishment." *Id.* § 3553(a), (a)(2)(A); *see also Mosley*, 277 F. Supp. 3d at 1298-99 (finding that "the extent to which the defendant's misconduct was the product of addiction" is relevant to this determination).

## V.

The court found at sentencing that Carter's criminal history category was V and that his base offense level under Guideline 2K2.1(a)(4)(A) was 20. The court sustained an objection to the adjustment for obstruction of justice under Guideline 3C1.1, and, as discussed above, it rejected the government's argument regarding the applicability of the enhancement for possession of a firearm in connection with another felony offense under Guideline 2K2.1(b)(6)(B). After those determinations and a two-level reduction for acceptance of responsibility under Guideline 3E1.1(a), the court found that Carter's total offense level was 18. This yielded a guidelines

range of 51-63 months of imprisonment.  For the reasons
discussed above, the court granted a variance of one and
a half years below this range, resulting in a sentence
of 33 months of custody.[4]

In addition to this term of imprisonment, the court
imposed a three-year period of supervised release.  In
her psychological evaluation, Dr. Flores recommended that
Carter's post-release conditions include at least 12
months of inpatient treatment for both his substance-use
disorders and his severe depression.  In her testimony,
she also recommended that after his inpatient treatment,
he take part in a program of continued substance abuse
treatment with a peer sponsorship component, such as is
available in Narcotics Anonymous, as well as further
outpatient mental-health treatment.  She noted that
Carter will likely need both medication and therapy to

_____

4.  It is also noteworthy that the
one-and-a-half-year variance came with a hitch.  For the
reasons behind the variance, and as explained later in
this opinion, Carter is still likely to serve an
additional year of inpatient treatment as a part of his
supervised release.

recover from the depression that has been present in his life since he was eight years old.

At sentencing, the court did not specify what treatment conditions will accompany Carter's supervised release. However, as soon as Carter is out of prison, the court has made clear that it will seriously consider ordering the long-term inpatient treatment recommended by Dr. Flores, and it will consider imposing additional treatment requirements as proposed by Dr. Flores or another evaluator, in consultation with counsel and Carter's probation officer.

After considering the testimony of both Carter and Dr. Flores, as well as Dr. Flores's detailed psychological evaluation, the court was convinced that Carter is ready to make changes in his life. The coming years will no doubt be difficult for him. This court knows well that the path to recovery is rarely straight. *See Mosley*, 312 F. Supp. 3d at 1294-95. But as the court told Carter at sentencing, it believes that his life remains salvageable. The court therefore offers him the

help he has never had before: treatment for his
depression and substance-use disorders to address,
finally, the consequences of his profound childhood
trauma.  With time and this assistance, the court is
confident that Carter has the capacity to heal.

As such, the court was persuaded that the sentence
it imposed was appropriately tailored to the seriousness
of Carter's offense, the circumstances of his conduct and
his mental-health history, and the need to provide him
effective treatment for his substance-use disorders and
his other trauma symptoms and sequelae.  *See* 18 U.S.C.
§ 3553(a).

DONE, this the 11th day of December, 2020.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE